HOWARD v. HOWARD.

(Supreme Court, Appellate Division, Third Department. November 11, 1903.)

1. WILLS—USE OF PROPERTY—ACTION AGAINST DEVISEE—EVIDENCE—SUFFI-
CIENCY.

Where a testator, in devising premises to his sons, directs that each shall have the right to a reasonable use of the water through pipes as constructed on the premises, in the absence of any evidence showing any interference by a devisee affecting the supply, or any unreasonable use of the water by him other than his refusal to permit a ditch on another portion of his premises after the obstruction of an existing ditch by a railroad through the premises, a grantee of the other cannot sustain a suit against him for diverting the overflow water from defendant's premises to plaintiff's pasture and obstructing the pipes.

Appeal from Judgment on Report of Referee.

Action by Electa Howard against Rush E. Howard. From a judgment for defendant, plaintiff appeals. Affirmed.

Argued before PARKER, P. J., and SMITH, CHASE, CHESTER, and HOUGHTON, JJ.

A. W. Boynton, for appellant.

Rowe & Pyrke (F. A. Rowe, of counsel), for respondent.

CHASE, J. In 1873 one Daniel M. Howard died the owner of a farm in the county of Essex, leaving a will by which he gave said farm and other property to his wife for life, and, subject to such life estate, he gave the south half of said farm to his son, the defendant, Rush E. Howard, and the north half of said farm to his son Harvey N. Howard, the husband of the plaintiff herein. The division line between the north and south halves of said farm was not defined by said will, nor established until after the death of said Daniel M. Howard. By his will he also provided:

"I also give my son Harvey N. Howard the right of bringing water through water pipes as now constructed on said farm from the Hammond brook, and the said Harvey N. and Rush are to be at equal expense in keeping said water pipes in repair down to the branch, and thereafter each one shall be at his own expense in keeping the said pipes in repair."

At the death of said Daniel M. Howard there was a system of log water pipes by which water was taken from the Hammond brook at a point westerly of the house on the southerly half of said farm, and brought to a tub at said house, and from said tub it was taken westerly a short distance to what is termed "the branch," and the waters were there divided, one part of which was taken in logs to the barn on the southerly half of said farm, and the other part was taken in logs to the house and buildings on the northerly half of said farm. A highway runs northerly and southerly through said farms on the

east side of the houses thereon, and the land slopes easterly from said highway. In 1876 a railroad was built across said farm in a deep cut nearly parallel with said highway and easterly thereof. As maintained by said Daniel M. Howard, the overflow water from the tub at the barn on the southerly half of said farm was carried in a blind ditch easterly, and the water run from the end thereof in an open ditch and on depressed lands through fields in a northeasterly direction. After the death of said Daniel M. Howard said Harvey N. Howard occupied the whole of said farm as the tenant of his mother for several years, and then the division line between the north and south halves thereof was established. The building of said railroad entirely cut off the flow of said waste water from said open ditch and depressed land. As the division line was established, it included in the pasture in the southeasterly corner of the north half of said farm a portion of the depressed land in which said waste water ran prior to the building of said railroad. After the division line between said farms was established, said Harvey N. Howard occupied the north half of said farm under a lease from his mother, and the defendant occupied the south half of said farm, also under a lease from his mother. On the 4th day of April, 1883, a written agreement was entered into by and between the widow of said Daniel M. Howard, said Harvey N. Howard, and the defendant, by which the widow of said Daniel M. Howard leased to Harvey N. Howard for three years from that date "that portion of the farm so set apart to and heretofore occupied by the said Harvey N. Howard, and as heretofore occupied by him." And she also leased to the said Rush E. Howard for three years from that date "that portion of said farm so set apart to and heretofore occupied by the said Rush E. Howard, and as heretofore occupied by him." They continued to occupy said farms, respectively, as lessees of their mother, until her death in January, 1902. About 21 years ago said Harvey N. Howard plowed a ditch along the westerly side of said railroad cut for the purpose of taking the waste water from said tub along said ditch into his pasture. The defendant filled up said ditch, and notified said Harvey N. not to come upon his property east of the road, and nothing further has ever been done by either in regard thereto. In the spring of 1898 the widow of said Daniel M. Howard caused to be written to the said Harvey N. Howard a letter relating to a renewal of his lease, in which letter, referring to said widow, it is stated:

"She is dissatisfied with the present situation as to water supply, and insists that it be changed. The idea seems to be that the line of pump logs is the occasion of frequent repair and digging up of the ground, etc., for this purpose is in every way an inconvenience, and very undesirable."

In this letter a proposition was made to the said Harvey N. Howard to obtain water from another source, and the said widow offered to pay the expense thereof, and the letter continues:

"Unless you are willing to give up the present source of supply, you and Rush must put in iron pipes from the dam down to the fork, and you replace your branch with iron from the fork as far north in the highway as she may require. * * * She proposes to take immediate control of the water pipes for making repairs, etc., at joint expense of yourself and Rush down to the fork and several expense beyond."

Subsequently Harvey N. Howard by letter replied:

"I accept the other offer [offer to relay pipe with iron] providing it is laid by a competent man, and in the same ditch. I will pay one half of expense for pipe and laying of the same to the branch and all expense as far north as she may desire."

The widow and life tenant then had the logs taken out, and new iron pipes were laid by a competent man, and, while a slight change was made at the intake from the creek, the pipes were laid in the old ditch. A one and one-half inch pipe was laid from the creek to the tub at the defendant's house and from that tub to the branch; a half-inch pipe was also laid from the tub to a new barn on the defendant's farm, and from the branch a half-inch pipe was laid to the defendant's old barn, and a one-inch pipe to the buildings on the north farm. From the time that Daniel M. Howard put in the water system there was what they called a "half-way plug," so that the water could be shut off between the defendant's house and the creek. All of these iron pipes were laid by direction of the widow and life tenant, and under the advice of the person who laid the iron pipes a "shut off" was put in the pipe between the creek and the tub at the defendant's house so that the water could be shut off in case it became necessary to clean the tubs. This shut off could only be turned with a wrench. Harvey N. Howard sold the north farm and all claims for damages by reason of the diversion of said water to his wife, the plaintiff. The defendant paid for one-half the expense of putting in said iron pipes, and became liable to pay the remaining half thereof. Neither Harvey N. Howard nor plaintiff has ever paid any part thereof. On the 24th day of April, 1902, following the death of said widow in January, this action was commenced. The plaintiff alleges that said defendant wholly diverted said water from said pasture, and so diverted and obstructed the flow of water in the pipe to the house of the plaintiff that the same has been either wholly stopped or greatly diminished, and rendered inadequate to the plaintiff's needs.

The rights of the parties must be determined by the will of Daniel M. Howard. The provisions of the will are plain. By the will Harvey N. is given the right to take water from the water pipes as they were then constructed, and the expense of keeping the main water pipe in repair is to be borne by the brothers in equal shares. The logs were replaced with iron pipe, and, even if Harvey N. did not assent to the change, a renewal of the water pipes, when necessary, is clearly included in the provision relating to repairs. At the death of their mother the main water pipe was substantially the same as it was at the death of Daniel M. Howard, except that it had been changed from wood to iron. The south farm then had an additional half-inch pipe from the tub in the main pipe to carry water to a new barn. The ditch carrying the waste water from the old barn as it existed at the time of Daniel M. Howard's death had been wholly destroyed by the building of the railroad. Nothing was done by the defendant between the time of his mother's death and the bringing of this action in any way affecting the water rights of the parties, and during that time no request appears to have been made by the plaintiff or by Harvey N. that any change should be made in the construction

of the pipes or the amount of water used by the defendant. It is not necessary, however, to consider the technical objections to the right of the plaintiff to recover. There is nothing in the will that either directly or indirectly gives to Harvey N. the right to have the overflow water from the tub at the old barn on the defendant's premises continue to run in the ditch as it existed when his father died. Even if any such right existed under the will, the changed conditions arising from the building of the railroad would require some new agreement to give the plaintiff a right to construct a ditch on another part of the defendant's lands. Under the will the owner of each farm is entitled to a reasonable use of the water upon his farm. If there is no obstruction to the water at the shut off, it appears by the testimony introduced by the plaintiff that she has a good supply of water with the conditions as they now exist. Harvey N. testified:

"I tried a number of times to find out the cause of deficiency. I found out since they put in that shut off. I went to defendant's house, and my son stayed at my place. I opened the cut off in defendant's shed, and the water ran good at my house. Then my son came there, and I went home, and he did the same, and the water ran good."

Plaintiff's son testified:

"Before we went to defendant's house, the water was running scarcely at all. While at the cut off it came very good. Then we changed places, and it came good. The supply at defendant's was abundant."

There is nothing, therefore, to show any unreasonable use of the water by the defendant. If the defendant interferes with the shut off to the plaintiff's injury, or uses an unreasonable amount of water, the plaintiff, if she has complied with all the provisions of the will on her part, might invoke a court of equity in her behalf; but the defendant denies that he has ever interfered with the shut off, and the evidence before us does not show any interference with, or unreasonable use of, the water by the defendant.

The judgment should be affirmed, with costs. All concur.